T.C. Memo. 1996-237


UNITED STATES TAX COURT


ESTATE OF ROBERT WELLFORD LINEWEAVER, DECEASED, NORTH
CAROLINA TRUST COMPANY, EXECUTOR,  Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 26399-93.                        Filed May 22, 1996.


<u>Howard L. Williams</u> and <u>Daniel M. Sroka</u>, for petitioner.

<u>Edwina L. Charlemagne</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

PARKER, <u>Judge</u>:  Respondent determined a deficiency in the
amount of $48,198.59 in Federal estate tax.

Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect at the time of decedent's

death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The issue for decision is whether the amount of $100,000 paid to decedent's former wife may be deducted as a claim against the estate under section 2053(a)(3).

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

Robert Wellford Lineweaver (decedent) died testate on June 14, 1990. The executor of decedent's estate is the North Carolina Trust Company.[1] The principal place of business of the executor was in Greensboro, North Carolina, at the time it filed the petition in this case. Decedent was domiciled in North Carolina on the date of his death.

Decedent and his first wife, now Kathleen Powell Lyon (Kathleen), were married on August 28, 1965. They had three children: Kelly, born February 12, 1969; Kathryn, born January 28, 1971; and Allison, born April 13, 1973.

During October of 1980, decedent and Kathleen asked Clifford Frazier, Jr., an attorney practicing in Greensboro, North Carolina, to prepare a deed of separation in anticipation of the termination of their marriage. Mr. Frazier provided legal

---

[1] The North Carolina Trust Company is a coexecutor, and decedent's brother, Francis B. Lineweaver, is the other coexecutor of the estate.

services to Unifi, Inc. (Unifi), a corporation of which decedent was then the president. Mr. Frazier informed the couple that if the separation was other than voluntary, Kathleen should consider obtaining separate counsel due to his position as Unifi's attorney.

Mr. Frazier prepared the Deed of Separation which decedent and Kathleen executed on December 1, 1980. He considered himself to be the scrivener of the Deed of Separation, drafting the document according to the parties' wishes, but not representing either party individually. Mr. Frazier had prepared at least two earlier drafts of the Deed of Separation.

Deed of Separation

The Deed of Separation granted Kathleen custody of the children. Decedent agreed to provide Kathleen, until the time of their divorce, with a monthly maintenance allowance of $2,500 for the support of herself and the children. Decedent agreed to pay child support of $1,500 per month after the divorce; this amount would increase to $1,800 per month on December 2, 1983.[2] The

---

[2] However, this $1,800 amount would be reduced as follows:

when Kelly reaches the age of eighteen (18) years, and has completed or no longer is attending high school, the monthly payments shall be reduced to $1,500.00 per month, when Kathryn reaches the age of eighteen (18) years, and has completed or no longer is attending high school, the payment shall be reduced to $1,000.00 per month, and when Allison reaches the age of eighteen (18) years, and has completed or is no longer attending high school, these support payments for said children

(continued...)

Deed of Separation set alimony at $1,000 per month from the time of the divorce until Kathleen's remarriage or the death of Kathleen or decedent.

Decedent was to provide for accident and health insurance for Kathleen until the earlier of his death or her remarriage, and for each child until the time the child turned 21 years old. Were Kathleen to become disabled as a result of sickness or accident so that she would be unable to work, and the monthly amount received from the accident or health insurance provided by decedent be less than $1,000, then decedent was to provide her with a sum so the combination of these payments equaled $1,000 per month. This obligation would end upon the earlier of decedent's death or Kathleen's remarriage.

The Deed of Separation allowed Kathleen to reside in the marital home until she remarried and to retain its furnishings as her separate property. The Lineweavers had two cars; the Deed of Separation granted Kathleen one car and decedent the other. Kathleen was to receive the $1,700 in one joint savings account plus a check for $3,300, for a total of $5,000. The Deed of Separation did not grant Kathleen any interest in decedent's

---

[2](...continued)
shall cease. In the event any of the children shall marry, or enter into the armed forces, or die, the monthly payments shall be reduced $300 per month for the first child to marry, or enter the armed forces, or die, $500 for the second child to do so, and all payments shall cease when the third child does so.

Unifi stock or in any of decedent's other assets.  The Deed of Separation also contained provisions regarding maintenance and future sale of the marital home and the payment of debts, the children's educational expenses, and income taxes.

Paragraph 12 of the Deed of Separation provided in regard to certain life insurance policies on decedent's life as follows:

> LIFE INSURANCE:  Mr. Lineweaver has various policies of life insurance, upon which Mrs. Lineweaver and/or the children are the beneficiaries.  Mr. Lineweaver agrees that he will not change the beneficiaries of said policies, which shall be delivered to Francis B. Lineweaver for safe keeping, until after he and Mrs. Lineweaver are divorced.  After the divorce, Mrs. Lineweaver shall, until she remarries, remain the beneficiary of life insurance policies providing regular coverage (as opposed to double indemnity) in an amount of not less than $100,000.00, with the beneficiaries of the remaining life insurance policies being the children, provided however that Mr. Lineweaver has the right to designate someone other than the children as beneficiaries of policies providing regular coverage (as opposed to double indemnity) of up to $100,000.00.  Mr. Lineweaver, after all the children have reached the age of twenty-one (21) years, and Mrs. Lineweaver has remarried, may make whomever he wishes the beneficiaries of any or all of his life insurance.

During the course of preparing the Deed of Separation, Mr. Frazier had revised certain provisions in response to the parties' requests.  In the early draft of the Deed of Separation, the life insurance paragraph (then paragraph 11) did not provide for Kathleen to remain a beneficiary of any of the husband's life insurance after the divorce.  The first two sentences of life insurance paragraph 11 were essentially the same as in the final version, but the third sentence (the "After the divorce"

sentence) and the fourth sentence were different.  The pertinent third and fourth sentences of that early draft read:

> After the divorce, the beneficiaries of said policies will be changed to the children, provided however that Mr. Lineweaver has the right to designate someone other than the children as beneficiaries of policies providing regular coverage (as opposed to double indemnity) of up to $100,000.00.  Mr. Lineweaver, after all the children have reached the age of eighteen (18) years, may make whomever he wishes the beneficiaries of any or all of his life insurance.

Kathleen wanted to remain a beneficiary after the divorce until she remarried and also wanted the children to remain beneficiaries until they reached age 21.  In a later draft the following third and fourth sentences appeared:

> After the divorce, Mrs. Lineweaver shall, until she remarries, remain the beneficiary of life insurance policies providing regular coverage (as opposed to double indemnity) in an amount of up to $100,000.00, with the beneficiaries of the remaining life insurance policies being the children.  Mr. Lineweaver, after all the children have reached the age of twenty-one (21) years, and Mrs. Lineweaver has remarried, may make whomever he wishes the beneficiaries of any or all of his life insurance.

In the final version of the "After the divorce" sentence, the version the spouses ultimately executed, the "up to $100,000.00" language in regard to Kathleen's interest was changed to "not less than $100,000.00".  In the final version the proviso in regard to Mr. Lineweaver's naming beneficiaries other than the children for insurance up to $100,000, which had appeared in the third sentence of the earlier draft, was added to the end of the new third sentence.  The fourth sentence remained the same in

this later draft and in the final version of the Deed of Separation. Mr. Frazier never saw any of decedent's insurance policies.

Kathleen was not represented by an attorney during the drafting of the Deed of Separation. She asked her father, a businessman, to review at least one of the drafts, and he apparently showed it to a lawyer. However, Kathleen never met with that lawyer. Decedent had told her that he would not leave the marital home until the agreement was signed, and that engaging an attorney would delay the separation. She wanted decedent out of the house as soon as possible to end her emotional distress. At the time Kathleen and decedent first went to Mr. Frazier's office to sign the final version, decedent had not secured a new residence. Mr. Frazier would not permit them to postdate the document, so a few days later, after decedent had actually moved out of the marital home, they returned to Mr. Frazier's office to sign the Deed of Separation on December 1, 1980.

Divorce and Equitable Distribution Action

Sometime after the execution of the Deed of Separation, North Carolina enacted an equitable distribution statute that became effective for divorces obtained after October 1, 1981. N.C. Gen. Stat. secs. 50-20, 50-21 (1987). The statute created a

type of "deferred community property law system" governing marital property in the case of divorce.[3]

On June 1, 1982, Kathleen filed a complaint in the District Court of Guilford County, North Carolina, seeking an absolute divorce[4] and equitable distribution of marital property.  In her Complaint, Kathleen alleged that the couple had accumulated marital property in excess of $2,000,000.  Decedent's Answer, filed June 22, 1982, denied this allegation and asserted that the Deed of Separation, referred to as a Separation Agreement, was a bar to Kathleen's claim, having "settled all alimony, support and property rights".

The Judgment of Divorce granting an absolute divorce was entered on June 29, 1982.  The Judgment recited, among other things, that

> the purported Separation Agreement dated December 1,
> 1980, is at issue between the parties and that the
> validity thereof and its enforceability is retained for
> further proceedings.  In the event said purported
> Separation Agreement is finally adjudged valid and
> binding and the Court concludes that [Kathleen] is not
> entitled to the benefits of the Equitable Distribution
> Act, said Agreement shall be incorporated nunc pro tunc
> in this Divorce Decree.

On July 1, 1982, Kathleen married Edwin R. Lyon, Jr.

---

[3]  See Estate of Waters v. Commissioner, 48 F.3d 838, 842 (4th Cir. 1995), affg. in part and revg. and remanding in part T.C. Memo. 1994-194.

[4]  At the time of the separation from Mr. Lineweaver, Kathleen did not contemplate remarriage, but about a year later she began seeing Edwin R. Lyon, Jr. and by mid-1982 wished to remarry.

On August 29, 1982, Kathleen filed a Reply to the Answer, alleging circumstances around the time of signing the Deed of Separation that would cause the instrument to be "null and void, or voidable, and of no legal effect".  Her Reply asserted that the Deed of Separation, irrespective of its validity or invalidity, did not bar her claim for equitable distribution.

Decedent's counsel took Kathleen's deposition on January 27, 1983.  During the deposition, Kathleen reconstructed the couple's negotiations based on the various drafts of the Deed of Separation and the handwritten notes thereon.  With regard to decedent's life insurance, Kathleen had wanted $100,000 of the benefits for herself if she had not remarried.  Also, it was Kathleen who wanted the children to reach 21, instead of 18, years of age before decedent could designate whomever he wished as beneficiaries.  In the deposition, Kathleen did not suggest that her benefits were dependent on the children's ages, or that the children's benefits were dependent on her marital status.

Decedent and Kathleen agreed to settle the equitable distribution action.  Decedent agreed to pay Kathleen $400,000 "in full and complete settlement of her marital property and other claims alleged or which could have been alleged in the * * * action.  The parties agree that the settlement shall be treated as a marital property division."  The termination of decedent's obligations under the Deed of Separation was never discussed during the settlement negotiations.

The Guilford County District Court entered a Consent Judgment on August 3, 1984, recording its approval of the settlement agreement.  A portion of the Consent Judgment reads:

> it appearing to the Court that this is an action for Absolute Divorce and Equitable Distribution and that [decedent] has pled a prior separation agreement in bar of [Kathleen's] marital property and money demands;
>
> And it further appearing to the Court that * * * the only matter currently pending is the claim of [Kathleen] for Equitable Distribution and sums allegedly due arising from the marital relationship;
>
> And it further appearing that [Kathleen] and [decedent] have agreed to a marital property settlement in a certain amount to be paid by [decedent] to [Kathleen] in full and complete satisfaction of all claims alleged or which could have been alleged in the pleadings;
>
> *   *   *   *   *   *   *

The Consent Judgment contains no decision on the Deed of Separation, nor did the court enter a separate judgment in regard to it.

Decedent made the settlement payment on August 3, 1984.  On that same date, Mr. L. P. McLendon, Jr., as Kathleen's attorney-in-fact, signed a Release of All Claims forever discharging decedent

> from any and all actions, causes of action, damages, costs, loss of services, expenses, compensation, suits, debts, claims, demands and obligations whatsoever, both in law and in equity, which I ever had, now have, or may hereafter have against [decedent] upon or by reason of any matter, case or thing up to the date of the execution of this release.

The Release also stated:  "This release contains the entire agreement between the parties hereto, and the terms of this release are contractual and not mere recitals."

Child Support

After the settlement, decedent continued to make child support payments.  However, a disagreement arose over the language in the Deed of Separation setting forth the amounts of child support to be paid.  Kathleen made a claim on decedent prior to his death for what she believed was the correct amount of child support.

Insurance Policies

Kathleen was the sole beneficiary on a policy on decedent's life in the face amount of $100,000 issued on May 18, 1978, by Provident Mutual Life Insurance Company of Philadelphia (Provident).  On March 10, 1982, Provident filed decedent's Change of Beneficiary with respect to this policy, naming Kathleen and decedent's executors as cobeneficiaries.  Upon decedent's death, Kathleen received $50,680.34 as a cobeneficiary of this insurance policy.

On December 1, 1980, none of decedent's children was a beneficiary of insurance policies on decedent's life; however, the children were beneficiaries of a revocable trust decedent had established on March 28, 1975.  The purpose of this trust was to fund a marital deduction trust for Kathleen and a residuary trust for the benefit of "the Grantor's wife, Kathleen Powell

Lineweaver, so long as she remains unmarried and/or the children or descendants of any deceased child of the Grantor".  On December 1, 1980, this trust was funded by nine insurance policies on decedent's life with face amounts totaling $375,000. Effective February 19, 1982, decedent changed the beneficiary on seven of these policies from the trust to decedent's estate.  On March 10, 1982, decedent made the same change on one more policy. At decedent's death, the executor of his estate received $251,206.97 in insurance proceeds and the trust received $312,095.88, from the one remaining policy, which had a face amount of $250,000.

## Wills

Decedent executed a will on February 15, 1982.  This will contained the following:

### CONTRACTUAL OBLIGATIONS

I entered into a Deed of Separation with my former wife, Kathleen Powell Lineweaver, hereinafter referred to as Kitty, under date of December 1, 1980.  The Deed of Separation contained among other things, provisions with reference to Kitty's continuing to live in the home known as 2 St. Francis Court, Greensboro, North Carolina, and to Kitty's remaining the beneficiary on life insurance policies providing regular coverage (as opposed to double indemnity) on my life in an amount of not less than $100,000.00.  I direct my Executor to carry out those obligations of mine set forth in the aforementioned Deed of Separation which survive my death.

At that time, Kathleen had not yet filed the divorce action and was still decedent's wife.

On October 2, 1984, after the divorce and after settlement of the equitable distribution action, decedent executed a new will (1984 will).  Attorney Ronald P. Johnson prepared the 1984 will.  Decedent had provided Mr. Johnson with a copy of the 1982 will, requesting only minor changes in the above quoted article and major changes in the other provisions.  Article IV of the 1984 will stated:

> I entered into a Deed of Separation with my former wife, Kathleen Powell Lineweaver, hereinafter referred to as "Kittie," under date of December 1, 1980.  The Deed of Separation contained among other things a provision requiring that Kittie remain the beneficiary on life insurance policies providing regular coverage on my life in an amount of not less than One Hundred Thousand Dollars.  I direct my Executor to see that Kittie receives the sum of One Hundred Thousand Dollars upon my death, either my [sic] means of life insurance or other assets if she is not then named the beneficiary of at least One Hundred Thousand Dollars of life insurance.

On November 12, 1987, decedent executed his final will (1987 will).  Mr. Johnson also prepared this will.  In the 1987 will, Article IV reads:

> I entered into a Deed of Separation with my former wife, Kathleen Powell Lineweaver, hereinafter referred to as "Kittie," under date of December 1, 1980.  The Deed of Separation contains among other things a provision requiring that Kittie remain the beneficiary on life insurance policies providing regular coverage on my life in an amount not less than One Hundred Thousand Dollars.  If at the time of my death, Kathleen Powell Lineweaver does not receive said one hundred thousand ($100,000.00) dollars of life insurance, I direct that my Executor distribute to Kathleen Powell Lineweaver cash in an amount which when added to the amount of life insurance she receives by reason of my death will equal one hundred thousand ($100,000.00) dollars.

Mr. Johnson, who drafted the 1984 and 1987 wills, thought that decedent was satisfied that Article IV mirrored his obligation under the Deed of Separation. Mr. Johnson had not seen and did not review a copy of the Deed of Separation when preparing either the 1984 or 1987 will. At the time he drafted the 1984 and 1987 wills, he was not aware of the nature of the domestic matter his firm had handled for decedent. Mr. Johnson was not familiar with either the Consent Judgment or the Release of All Claims. It is uncertain whether in 1984 and 1987 Mr. Johnson knew of the divorce and Kathleen's remarriage. All three wills refer to Kathleen as Kathleen Powell Lineweaver, even though she had remarried a few months after the 1982 will was executed and had taken the name of Kathleen Powell Lyon in 1982. Mr. Johnson did not make any independent investigation as to the nature of any obligation decedent had in regard to paying Kathleen an amount of $100,000 either by means of life insurance or other assets.

Article II of the 1987 will directed that decedent's executor

> shall make such claim as is permitted by law for any
> such death taxes assessed against my estate as a result
> of the inclusion in my estate of * * * any insurance
> policies payable to beneficiaries other than my
> Executor * * *

Estate Administration

After Kathleen received the $50,680.34 of life insurance proceeds, she made a claim against decedent's estate for the

shortfall of nearly $50,000.  The estate paid Kathleen $25,000 by check dated October 19, 1990.  In keeping with decedent's instructions in Article II of the 1987 will, the estate withheld the remaining amount pending resolution of the estate taxes due.

The estate issued Kathleen a check in the amount of $20,000 on March 8, 1991, in settlement of her claim for back child support.  On March 12, 1991, Kathleen signed a Release of All Claims for Child Support "accrued at any time through the date of this release, specifically including, but not limited to, the sum of Three Hundred and No/100 ($300.00) Dollars per month additional child support due from September 1984, through March 1990."

On Schedule K of the Federal estate tax return, the estate claimed a deduction of $100,000 listed as "Kathleen L. Lyon - insurance owed per separation agreement."  Schedule K contained a notation that $25,000 of the $100,000 remained unpaid. Respondent disallowed the $100,000 deduction in full.

## OPINION

Section 2053(a)(3) provides a deduction from the value of the gross estate for the amount of a claim against the estate as allowable by the law of the jurisdiction under which the estate is being administered.  In the case of a claim founded on a promise or agreement, the deduction is "limited to the extent that [it was] contracted bona fide and for an adequate and full

consideration in money or money's worth * * * ".  Sec.
2053(c)(1)(A).

Respondent has disallowed the estate's deduction of $100,000
on the ground that decedent was under no obligation on the date
of his death to pay Katherine such an amount.[5]  The estate argues
that decedent was obligated to provide Kathleen with at least
$100,000 of insurance proceeds until such time as she remarried
and all three children had reached age 21.  Respondent argues
that under the Deed of Separation, decedent was obligated to
maintain Kathleen as beneficiary only until she remarried.
Alternatively, respondent argues that the Consent Judgment and
Release of All Claims executed on August 3, 1984, settled all
marital property rights and terminated decedent's obligation
under the Deed of Separation to name Kathleen as beneficiary.

We are faced with the task of construing the life insurance
provisions in the Deed of Separation in accordance with North
Carolina law.  The construction of a separation agreement is
governed, in general, by the rules and provisions applicable in
the case of other contracts.  Bowles v. Bowles, 237 N.C. 462,
465, 75 S.E.2d 413, 415 (1953).  The heart of a contract is the
intention of the parties which must be determined from the
language of the contract, the purposes of the contract, the
subject matter, and the situation of the parties at the time the

---

[5] Respondent does not dispute the adequacy of consideration
for the promises contained in the Deed of Separation.

contract is executed.  <u>Bolton Corp. v. T.A. Loving Co.</u>, 317 N.C. 623, 628, 347 S.E.2d 369, 372 (1986); <u>Bowles v. Bowles</u>, <u>supra</u>.

Evidence of the parties' subsequent conduct is admissible; if the language used in the contract gives rise to a doubtful meaning, the parties are presumed to know best their intent. <u>Management Systems Associates v. McDonnell Douglas Corp.</u>, 762 F.2d 1161, 1171-1172 (4th Cir. 1985); <u>Commercial Natl. Bank of Charlotte v. Charlotte Supply Co.</u>, 226 N.C. 416, 432, 38 S.E.2d 503, 514 (1946) ("The conduct of the parties in dealing with the contract indicating the manner in which they themselves construe it is important, sometimes said to be controlling in its construction by the court.").  Where the meaning of a written contract is unclear, parol evidence may be used to explain the agreement of the parties, but it cannot be used to alter or contradict any of its provisions.  <u>Jaftex Corp. v. Aetna Casualty & Surety Co.</u>, 617 F.2d 1062, 1063 (4th Cir. 1980); <u>Bost v. Bost</u>, 234 N.C. 554, 558, 67 S.E.2d 745, 747 (1951).  "All parts of a contract are to be given effect if possible.  It is presumed that each part of the contract means something."  <u>Bolton Corp. v. T.A. Loving Co.</u>, 317 N.C. at 628, 347 S.E.2d at 372.

The estate argues that decedent's conduct of including Kathleen in three wills, two of which were written after their divorce, indicates that the spouses intended decedent's obligation to continue until after all the children reached 21 and Kathleen had remarried (hereinafter both conditions).  At the

time he executed his 1982 will, decedent was clearly under a legal obligation to retain Kathleen as a beneficiary on his life insurance in an amount of at least $100,000, since the spouses were not then divorced and Kathleen had of course not remarried. The 1982 will directs decedent's executor "to carry out those obligations of mine set forth in the aforementioned Deed of Separation which survive my death."  No such language appears in Article IV of the 1984 and 1987 wills.  The 1984 and 1987 wills make no reference to any event terminating decedent's obligation, yet, it is clear that once both conditions were met, decedent would no longer have any such obligation under the Deed of Separation.  Mr. Johnson, the attorney who drafted the 1984 and 1987 wills, failed to consult the Deed of Separation and, if he knew about the divorce and Kathleen's remarriage, he failed to consider the effect of Kathleen's remarriage when drafting those later wills.  Mr. Johnson was wholly unfamiliar with the terms of the Deed of Separation; he simply accepted decedent's representation that the 1982 will mirrored the terms of the Deed of Separation and that decedent did not want any changes in Article IV of the will except a few minor word changes which Mr. Johnson made.  The Court accepts that the 1982 will did mirror decedent's obligation under the Deed of Separation at the time that will was executed; however neither Mr. Johnson nor decedent seems to have considered the fact that in the intervening period there had ensued a divorce and Kathleen's remarriage.  In any

event, the language of the respective wills does not lend assistance in determining the intent of decedent and Kathleen in executing the 1980 Deed of Separation.

Kathleen's testimony at trial is of minimal assistance due to her limited recollection of events 14 years ago.[6]  A review of the chronological evolution of the drafts of the Deed of Separation and Kathleen's deposition testimony in early 1983 in the equitable distribution action provide the most probative and most contemporaneous construction of the Deed of Separation.

There are two drafts and the final version of the life insurance paragraph of the Deed of Separation, numbered paragraph 12 in the final version and numbered paragraph 11 in the two drafts.  In both drafts and in the final version, the first sentence recites that decedent had various life insurance policies of which Kathleen and/or the children were the beneficiaries.[7]  The second sentence in both drafts and in the

---

[6]  The testimony of the various lawyers involved in drafting the Deed of Separation, in drafting the 1984 and 1987 wills, and in prosecuting or defending the equitable distribution action was generally conclusory and not particularly informative on the critical issue in this case.  None of them had any files or notes on the issue in this case.  Mr. Frazier admitted he was simply a scrivener writing down the parties' wishes in the Deed of Separation and not representing either spouse.  Mr. Johnson knew nothing about the Deed of Separation or the nature of the domestic matter his firm had handled for decedent.  It is not clear that in 1984 and 1987 Mr. Johnson even knew about Kathleen's remarriage.

[7]  In fact the children were not beneficiaries of any of the policies at the time the Deed of Separation was executed or
(continued...)

final version stated that decedent will not change the beneficiaries of these policies until the divorce.[8]  The third sentence, which we refer to as the "After the divorce" sentence, involved the most changes in the evolution of the life insurance paragraph.  In the early draft, the "After the divorce" sentence read as follows:

> After the divorce, the beneficiaries of said policies will be changed to the children, provided however that Mr. Lineweaver has the right to designate someone other than the children as beneficiaries of policies providing regular coverage (as opposed to double indemnity) of up to $100,000.00.

Kathleen objected to that language because she wanted to be a beneficiary for an amount of $100,000 of life insurance after the divorce and until she remarried.[9]  At the time the Deed of

---

[7](...continued)
thereafter.

[8]  This provision remained essentially the same in both drafts and in the final version, the only difference being as to who was to hold the policies for safekeeping.  In the early draft, there was a blank for the person's name and handwritten in the blank was the name of decedent's brother, Francis B. Lineweaver.  In the next draft the name of Francis B. Lineweaver was typed in, and no further changes were made in that second sentence in the final version.

[9]  During her deposition on January 27, 1983, Kathleen was questioned about the first draft of the life insurance paragraph (which is paragraph 11 of what we have called the early draft) as follows:
> Q  All right.  Now what was your next change on the first draft?
> A  Under life insurance, Paragraph 11, same page. There was a blank on the end of the fourth line.  It was talking about---  "Mr. Lineweaver agrees that he will not change the beneficiaries of said policies,
(continued...)

Separation was being drafted, Kathleen was not contemplating remarriage.  See supra note 4.  In the next draft this "After the divorce" sentence was revised to read:

> After the divorce, Mrs. Lineweaver shall, until she remarries, remain the beneficiary of life insurance policies providing regular coverage (as opposed to double indemnity) in an amount of up to $100,000.00, with the beneficiaries of the remaining life insurance policies being the children.  [Emphasis added.]

Kathleen objected to the "up to $100,000.00" language, and decedent still wanted to be able to name a beneficiary other than the children for some of the insurance up to $100,000.  In the final version both spouses seem to have gotten what they wanted.

---

[9](...continued)
which shall be delivered to 'blank'."  And he put his brother's name there.

Q  And that was carried into the final form?
A  I assume it was.
Q  I will again show you the agreement which we marked this morning in the final form and ask you if that was not, in fact, included in the final document.
A  Yes.
Q  All right.
A  It says, "After the divorce, the beneficiaries of said policies will be changed to the children, provided, however, that Mr. Lineweaver has the right to designate someone other than the children as beneficiaries."
    I wanted part of that to go to me - a hundred thousand - if I had not remarried.
Q  All right.  Now that was also, in fact, carried into the final document, was it not?
A  Yes.
Q  So the final showed that if you had not remarried, a hundred thousand dollars worth of life insurance would be made payable to you as beneficiary?
A  Right.  [Emphasis added.]

In the final version that the parties executed, the "After the divorce" sentence read as follows:

> After the divorce, Mrs. Lineweaver shall, until she remarries, remain the beneficiary of life insurance policies providing regular coverage (as opposed to double indemnity) <u>in an amount of not less than $100,000.00</u>, with the beneficiaries of the remaining life insurance policies being the children, <u>provided however that Mr. Lineweaver has the right to designate someone other than the children as beneficiaries</u> of policies providing regular coverage (as opposed to double indemnity) <u>of up to $100,000.00</u>. [Emphasis added.]

The evolution of this third sentence of the life insurance paragraph clearly shows that Kathleen was to remain a beneficiary of policies after the divorce and "until she remarries".[10]

Contrary to that clear "until she remarries" language in the third sentence, the estate argues that the fourth sentence of the life insurance paragraph imposes two conditions for the termination of her right to be named as a beneficiary on insurance policies in an amount of at least $100,000; namely both her remarriage and having all three children reach the age of 21. The Court finds this to be a strained and illogical reading. In the early draft where Kathleen was not a beneficiary at all after the divorce, the proposed fourth sentence read:

---

[10] Much of the confusion at trial on the part of counsel for both parties and the Court was caused by a collective failure to consider the evolution of the language of this third sentence. The Court found confusing and ambiguous the final "provided however" clause because its derivation was not clear to the Court during the trial. The Court did not find confusing or ambiguous the "until she remarries" language.

> Mr. Lineweaver, after all the children have reached the age of eighteen (18) years, may make whomever he wishes the beneficiaries of any or all of his life insurance.

Kathleen objected and wanted the children to be covered until they reached age 21. In the next draft, the age was changed to 21. Also in that next draft Kathleen was, until she remarries, to remain a beneficiary of policies in an amount up to $100,000. The remarriage of Kathleen was also added to the fourth sentence of that next draft. That addition to the fourth sentence is not in conflict with the "until she remarries" language in the third sentence. Without such an addition, an ambiguity could be injected; namely, it could be argued that she would no longer remain a beneficiary once the daughters reached age 21 even if she had not remarried by that time. The fourth sentence in that draft read:

> Mr. Lineweaver, after all the children have reached the age of twenty-one (21) years, and Mrs. Lineweaver has remarried, may make whomever he wishes the beneficiaries of any or all of his life insurance.

This fourth sentence was not changed in the final version.

The estate reads the fourth sentence as extending Kathleen's coverage beyond her remarriage, contrary to the language in the third sentence. A more logical interpretation is that the fourth sentence protects her against termination if she has not remarried by the time the children reach 21, terminating the children's rights when they reach 21 and terminating her right when she remarries. This reading is consistent with the "until

she remarries" language in the third sentence.  This reading
reconciles the two sentences rather than nullifying the "until
she remarries" language of the third sentence.

In addition to being a common sense reading of the life
insurance paragraph as a whole, considered in the light of the
evolution of the language of sentences three and four, the
Court's reading is consistent with Kathleen's testimony at the
deposition in 1983 when she was much closer in time to the
pertinent events and before the present controversy arose.[11]

Based on the above, we conclude that the spouses intended
that Kathleen be named the beneficiary of at least $100,000 of
decedent's life insurance until she remarried.  To give effect to
Kathleen's interpretation that both conditions must be met in
order to terminate decedent's obligation is to render superfluous
the words "until she remarries" in the third sentence, which we
decline to do.  We hold that decedent on the date of his death
was no longer obligated to maintain Kathleen as beneficiary on

---

[11] Kathleen is essentially the real party in interest in
this case.  The estate declined to prosecute the present claim,
but permitted Kathleen through her attorneys and at her expense
to bring the present case in the estate's name.  The estate is
required to pay $100,000 to Kathleen, regardless of whether the
$100,000 is deductible as a debt of decedent.  However, under
Article II of the 1987 will, Kathleen is liable for any estate
tax due with respect to the life insurance proceeds she received
as a cobeneficiary under one policy of life insurance on
decedent's life; if the estate is allowed a deduction for the
$100,000 as a claim against the estate, Kathleen will not be
liable for any estate tax in regard to the insurance proceeds.

$100,000 worth of life insurance.  Because of our holding, we need not address respondent's alternative argument.[12]

In keeping with the above holding,

Decision will be entered

for respondent.

---

[12]  For completeness, we have, however, included the pertinent facts in regard to the settlement agreement and release in the equitable distribution action.